(157 App. Div. 416.)

### FLAHERTY v. MEADE TRANSFER CO.

(Supreme Court, Appellate Division, First Department. June 13, 1913.)

1. MUNICIPAL CORPORATIONS (§ 706*)—INJURIES FROM USE OF STREETS—ACTIONS—EVIDENCE—SUFFICIENCY.

In an action to recover damages for the death of one run over by a truck, evidence *held* not sufficient to show that the driver was negligent in starting the truck.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 1518; Dec. Dig. § 706.*]

2. DEATH (§ 23*)—ACTIONS—CONTRIBUTORY NEGLIGENCE OF DECEASED.

Where one has voluntarily placed himself in front of the rear wheel of a truck, while waiting for it to start, and therefore could not recover if he had survived the injury, his personal representative cannot recover for his death.

[Ed. Note.—For other cases, see Death, Cent. Dig. §§ 25, 26; Dec. Dig. § 23.*]

Appeal from Trial Term, New York County.

Action by Annie Flaherty, administratrix, against the Meade Transfer Company. Judgment for the plaintiff, and defendant appeals. Reversed and remanded for new trial.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, CLARKE, and SCOTT, JJ.

E. Clyde Sherwood, of New York City (William B. Davis, of New York City, on the brief), for appellant.

John C. Robinson, of New York City, for respondent.

LAUGHLIN, J. This is a statutory action to recover for the death of Frank Flaherty, alleged to have been caused by the negligence of the defendant. The defendant was engaged in the business of trucking, and about quarter past 5 o'clock in the afternoon on the 4th day of May, 1912, one of its trucks, which was not loaded, was being driven by one of its employés northerly on West street, and the left hind wheel came in contact with the decedent opposite the intersection of Christopher street with West street, precipitating him to the pavement and running over him, causing injuries from which he died almost immediately.

[1] The negligence with which the defendant is charged in the complaint consists of a general charge of negligence in driving the horses and truck. The negligence claimed to have been established

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes.

by the evidence is that the driver of the truck, after stopping to permit the passage of Christopher street cars to and from the Delaware, Lackawanna & Western Ferry, turned his team to the left and started on an angle of about 45 degrees from the direction his wagon and team were facing while standing there, and that this was done without any warning to pedestrians lawfully on the street.

West street runs nearly north and south, and the carriageway of the street on the east side of the open space between the pier sheds and the easterly curb of West street is paved with granite blocks for a width of about 50 feet from said curb, and at about the middle of this pavement there is a double-track street car line. Between the westerly edge of the granite pavement and the easterly line of the pier sheds there is an open space about 132 feet in width, paved with asphalt. Evidently with a view to protecting pedestrians from vehicles, five safety aisles or platforms have been constructed in this open space between the northerly line of Christopher street continued and the northerly line of Barrow street, which intersects West street a short block south of Christopher street. Three of these safety aisles or platforms are nearly in a line, north and south, just to the west of the westerly line of granite pavement, the northerly one being about on a line with the northerly sidewalk of Christopher street continued, and a little to the north of the Christopher street car tracks, which cross this open space to the ferry; and another one is about 39 feet southwest of the one lastly described, and also nearly on a line with the north sidewalk of Christopher street continued, but somewhat nearer the car tracks. A policeman was stationed at the intersection of Christopher and West streets to regulate traffic, and evidently the traffic regulations required that the north and south bound vehicles on West street should pass between the two aisles of safety, or platforms lastly described, which were distant 39 feet from each other, measured diagonally. The street car tracks at this point were being changed or repaired, and a temporary way across the tracks, about 15 feet in width, had been constructed of planks, which afforded a passageway for vehicles bound in either direction at the same time.

At the time in question the police officer was temporarily absent, and at his request the starter for the street railway company agreed to act for him. The starter signaled vehicles north and south bound on West street to stop, and signaled cars to pass east and west. When these signals were given, the defendant's truck was approaching in the vicinity of the crossing, and it was stopped with the heads of the horses about 10 feet from the first rail of the track. The evidence is conflicting with respect to the length of the stop, but it indicates that it was probably for a period of one or two minutes. There appears to have been a solid line of vehicles in the rear of the defendant's truck which cut off the passage of pedestrians from either side to the other.

The defendant's truck was known as a "swing" or "reach" truck, and it evidently was designed for transporting girders or timbers supported by being swung underneath and occupying the space where the reach is in ordinary vehicles, the rear axle being bent or curved up,

and two parallel timbers, 1 foot 6 inches apart and 35 feet in length and 10 inches in height, connected the front and rear axles; the rear wheels being 6 feet 6 inches in height, and the tires being 6 inches in width.

While the truck was standing there it appears that several pedestrians approached it from either side, and most of them stopped, but a few passed under the truck; and some of the evidence tends to show that there were 25 or 30 people on the west side of the truck and a number on the east side waiting to cross the street after the truck started. There was also a line of vehicles south bound in West street, headed by a motor truck which came to a stop north of the street car tracks. When the starter signaled these vehicles to cross the tracks, the defendant's driver turned his horses to the left at an angle of 45 degrees, according to the testimony of some of the witnesses, and did so with a view to enabling him to cross the tracks on this temporary way. It does not appear whether or not the driver knew that people were standing on either side of the truck. According to the testimony of a witness for the plaintiff, who stood near the decedent at the side of the truck, the driver, on starting, called or hollered to the horses to start. Two witnesses testified that the decedent came from the east side of the truck and attempted to pass under it, and was struck and knocked down by it; but the learned trial court instructed the jury that the defendant would not be liable if the accident occurred in that manner, and would only be liable on the theory of the case as developed in behalf of the plaintiff on the trial, namely, that the decedent was standing to the west of the truck, and was run down by it. There is no evidence that a signal or warning that the truck was about to start was not given by the driver. The only evidence on that point is the testimony with respect to the driver calling or halloaing to his horses, which was evidently plainly heard by a witness standing near the decedent, and some general evidence that the driver was not observed to do or say anything else.

The chauffeur of the south-bound motor truck, who was called as a witness for the plaintiff, testified, in substance: That as he started up he observed 25 or 30 people standing along the westerly side of the truck "lined up against the truck, because there was another truck right behind, * * * and they could not go through that way, so they waited" in a position where the truck would have just cleared them by a few inches, if it moved straight ahead. That on starting the truck it was necessary for the driver to turn the horses to the west at an angle of about 45 degrees to enable him to clear rubbish and a torn-up part of the street car tracks, and to cross on the temporary way, and that on thus starting "the front of the truck followed the team." That after the front of the truck moved a few feet (he says it had not moved more than from 12 to 15 feet at the time of the accident) the team and part of the truck straightened up to the north again. That as the truck started the people who had been standing alongside the truck "and near the rear wheel started to push back to get back out of the way. They went back pretty lively. All went back." And that as he turned to say "good night" to the driver of the team he

saw the decedent grab his head and fall. This witness admitted, however, that he had testified on the coroner's inquest that he saw the decedent, before he was hit, standing "between the two wheels pretty close up to the string piece," not touching it, but between it and the edge of the wheel, and that such testimony was true.

One witness, who was driving a truck and was in the line considerably to the rear of the defendant's truck and intending to turn into Barrow street, was called by the plaintiff and testified on direct examination with respect to the manner in which the truck started; and on cross-examination he testified, among other things, that before the accident he saw the decedent standing about one foot in front of the left hind wheel and within the space between the front and rear wheels and about one foot from the timber running lengthwise of the wagon, which was shown by other evidence to be one foot and nine inches inside the wheels, and that he saw another man in that space, but not so near the rear wheel as the decedent, and as the truck started the other man jumped back, and the decedent tried to do so, but was caught by the wheel.

[2] If the decedent was waiting with others for the truck to move to enable him to cross the street, he was chargeable with knowledge of the fact that it was likely to move at any time; and if he voluntarily placed himself in front of the rear wheel, as the testimony of these witnesses indicates, and was struck or caught by the wheel in endeavoring to get back out of the line of the truck, he would have no cause of action if he had been injured and survived, and, if so, of course, his personal representative cannot recover. If the accident occurred in that manner, the defendant would only be liable for willfully running over him, and that is not charged; nor does it appear that the driver knew that he was in a position of danger.

The testimony of another witness for the plaintiff, who claims to have seen the decedent, is to the effect that he was standing 3 or 4 feet west of the defendant's truck, nearer the rear than the center, waiting for it to pass, and about 4 or 5 feet from the rear westerly wheel; that the decedent stood about 2½ feet north of the rear westerly wheel and about one foot to the west thereof, in a position where the hub of the wheel would have cleared him by about a foot if the vehicle had moved straight ahead; that when the truck started it swung to the west, and he heard the decedent say to the people behind him, who were waiting for the truck to pass, "get back," but that they did not, and appeared to be afraid to do so owing to the southbound traffic which was coming; and with respect to the manner in which the accident occurred he said, "The people in front may have shoved him under the wheel, or the wheel came out too far and caught him." The driver of the truck testified that he turned a little to the west on starting, but he does not admit that he made as sharp a turn as other evidence tends to show, and some of the witnesses say that he proceeded straight ahead without turning.

The only evidence, therefore, in support of the plaintiff's case is the evidence with respect to the manner in which the driver started the truck. He had a lawful right to start the truck, and pedestrians were

chargeable with knowledge of the fact that it might be necessary for him to change his course on starting, if it be true that he was not in line with the temporary way over the car tracks, or that the street was obstructed; but, of course, they had a right to assume that he would not go around in a circle and mow them down without giving warning and affording them an opportunity to reach a place of safety. In thus crowding in between two lines of passing vehicles, however, they took chances on being struck, if they got within the course it became necessary for the truck to take to pass up the street. The preponderance of the evidence and the probabilities of the case tend to show that the driver of the truck did not make such an abrupt turn as is claimed, and that if the decedent stood where the witness who was standing near him locates him the accident would not have happened. If, as is indicated by the evidence, the lines upon which the traffic was passing north and south were so close that a crowd of 25 or 30 people standing or "lined up" along the side of a truck were so disturbed concerning their safety from south-bound vehicles that they did not fall back, it would have been impossible for the driver to have turned his horses to the west to such an extent that the left rear wheel, in moving forward two feet and seven inches, would move to the west of the north and south line, which the vehicles occupied while standing, one foot and the width of the hub in addition, without getting in the path of the south-bound traffic and coming in collision therewith or obstructing it, and the evidence does not show that this occurred; for the south-bound motor truck started up when the truck started, and was passing at the time of the accident. We are of opinion, therefore, that the verdict is clearly against the weight of the evidence, at least in so far as it is predicated upon negligence on the part of the driver of the truck.

It follows that the judgment and order should be reversed, the finding that defendant was guilty of negligence reversed and a new trial granted, with costs to appellant to abide the event. All concur.